# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | | |
|---|---|---|
| **MICHAEL FISHER AND ELISA FISHER,** | § | |
| **Individually and as Next Friends and** | § | |
| **Guardians of D.F., a Minor,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **Civil Action No.  3:13-CV-408** |
| | § | |
| **BUMBO INTERNATIONAL TRUST f/k/a** | § | **JURY DEMANDED** |
| **JONIBACH MANAGEMENT TRUST,** | § | |
| **and TOYS "R" US - DELAWARE, INC.** | § | |
| **d/b/a BABIES "R" US** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Michael Fisher and Elisa Fisher, Individually and as Next Friends and Guardians of D.F., a Minor, (collectively "PLAINTIFFS") hereby file their Original Complaint, and complain of Defendant Bumbo International Trust f/k/a Jonibach Management Trust and Toys "R" Us – Delaware, Inc. d/b/a Babies "R" Us as follows:

## JURISDICTION AND VENUE

1.     The present action alleges strict product liability, negligence, and bystander liability arising out of PLAINTIFFS' use of the BUMBO BABY SITTER.

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

3.     The Court has personal jurisdiction over each Defendant.  Each Defendant has conducted and does conduct business within the State of Florida.  Each Defendant contracts

with entities who do business within the State of Florida.  Moreover, each Defendant, directly and/or through intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and/or advertises the BUMBO BABY SITTER, in the United States, the State of Florida, and the Northern District of Florida.  Each Defendant has purposefully and voluntarily placed the BUMBO BABY SITTER into the stream of commerce with the expectation that it will be purchased by consumers in the Florida. The BUMBO BABY SITTER has been and continues to be purchased by consumers in the Florida.  In addition, this Court has personal jurisdiction over BABIES "R" US because BABIES "R" US owns and operates over 60 stores in Florida wherein it employs Florida residents, recruits Florida residents, advertises to Florida residents, contracts with Florida entities, owns and leases property in Florida, and pays and collects taxes in Florida. In fact, Florida houses one of the largest concentrations of Toys "R" Us stores in the nation.  In addition, via its website, www.babiesrus.com, BABIES "R" US sells products directly to millions of Florida residents every year. And, perhaps most importantly, PLAINTIFFS purchased their BUMBO BABY SITTER (the BUMBO BABY SITTER that forms the basis of this suit) at a BABIES "R" US store in Florida.  And it was in Florida that PLAINTIFFS used their BUMBO BABY SITTER with their child, D.F., and it was in Florida that D.F. was seriously injured by the BUMBO BABY SITTER.

4.      Venue is proper in this District under 28 U.S.C. § 1391(a)(1) because Defendants "reside" in the Northern District of Florida – as that term is defined by 28 U.S.C. § 1391(c) – because Defendants are subject to personal jurisdiction in the Northern District of Florida.

## PARTIES

5.      PLAINTIFFS Michael Fisher and Elisa Fisher, Individually and as Next Friends and Guardians of their son, D.F., a minor, are individuals who presently reside in and are citizens of Waukegan, Illinois.  PLAINTIFFS resided in Key West, Florida at the time they purchased the BUMBO BABY SITTER, and they resided in Key West, Florida at the time the injuries were first inflicted on PLAINTIFFS that are pertinent to this action.

6.      Bumbo International Trust f/k/a/ Jonibach Management Trust (now trading as Bumbo International) is a South African entity based in Gauteng, South Africa (hereinafter referred to as "BUMBO").  BUMBO <u>does not</u> maintain a registered agent within the State of Florida despite selling thousands of products here.   South Africa is not a party to the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, commonly referred to as the Hague Service Convention.  Nor is South Africa a signatory to <u>any</u> treaty with the United States that would allow service of process through any traditional means.  BUMBO has continuously conducted, engaged in and carried out business in the state of Florida.   Accordingly, service upon BUMBO may be accomplished by serving the Florida Secretary of State, via FLA. STAT. § 48.181, for all of the following reasons: (1) BUMBO is a non-resident; (2) BUMBO is and has been continuously engaged in business in Florida by selling thousands of BUMBO BABY SITTERS in Florida; (3) BUMBO does not maintain a regular place of business in Florida; (4) BUMBO does not have a designated agent for service of process; (5) this lawsuit arises from BUMBO's business in Florida; and (6) PLAINTIFFS were injured as a result.

7.      Toys "R" Us – Delaware, Inc. d/b/a Babies "R" Us (hereinafter referred to as "Babies "R" Us") is incorporated in the State of Delaware and has its principal place of

business at One Geoffrey Way, Wayne, New Jersey, 07470-2035.  Babies "R" Us may be served by serving its registered agent for service of process, Prentice-Hall Corporation System, Inc., 1201 Hayes St. Ste. 105, Tallahassee, FL 32301.

## FACTUAL ALLEGATIONS

8.      The BUMBO BABY SITTER is designed for use exclusively by infants. Specifically, the BUMBO BABY SITTER was designed and marketed "to seat babies independently in an upright sitting position from as young as 3 months up to an age of approximately 14 months . . . thereby providing a snug and cozy environment for your baby."

9.      The BUMBO BABY SITTER was actively marketed for use on elevated surfaces.  In fact, website photos depicting the BUMBO BABY SITTER routinely showed it being used on top of tables, countertops, and even on top of a piano bench.  And, the very box in which the BUMBO BABY SITTER was sold contained a picture of three infants sitting in BUMBO BABY SITTERS on top of a table, at a birthday party, with cake and balloons.  There are no adults anywhere in the birthday party photograph:



10.     The BUMBO BABY SITTER was also advertised as being "your extra set of hands," and was advertised as "promotes eye-level interaction."  Moreover, the BUMBO BABY SITTER was marketed as being safe to use "on any flat surface."  In fact, the following photograph, which shows a mother feeding a baby on top of a table, was also on the BUMBO box, and appeared on websites advertising the BUMBO BABY SITTER for sale:



In fact, Antoinette Wagenaar, an officer, director and trustee of BUMBO, testified under oath that the BUMBO BABY SITTER was safe to use on any level surface, that passive restraints keep the children safely in place, and that it was okay to place an infant in the BUMBO BABY SITTER on a raised surface so long it was "within reach."

**A.      The Consumer Products Safety Commission Recalled The BUMBO Baby Sitter on October 25, 2007.**

11.     After receiving twenty-eight (28) reports of children falling out of BUMBO BABY SITTERS, including reports of three skull fractures, the U.S. Consumer Product Safety Commission (the "CPSC") recalled the BUMBO BABY SITTER on October 25, 2007.  On that date, the CPSC issued a press release stating: "Serious Head Injuries Prompt Recall of

BUMBO Baby Sitter Seats - New Warnings and Instructions to Be Provided to Consumers."[1] As part of the recall, the CPSC mandated that new warnings be placed on the BUMBO BABY SITTER and that the photograph of the birthday party be removed from the BUMBO BABY SITTER'S packaging because that photograph could lead consumers to believe that it was safe to use the BUMBO BABY SITTER on elevated surfaces. Although BUMBO begrudgingly complied with the recall that the CPSC forced on it, Bumbo made sure that consumers understood that BUMBO did not think that the recall was warranted or necessary by posting on its website that the recall was the "Lamest Recall in the History of the World."

**B.**     **Children Continue to Be Injured After the Recall.**

12.     In spite of the October 2007 recall, and the changes that were made to the BUMBO BABY SITTER's warning language, children continued to be seriously injured while using the product.  In fact, as of May 2010, BUMBO was aware of more than 200 incidents where infants had come out of the BUMBO BABY SITTER.[2]  Recognizing that the recall measures had not stopped senseless injuries to children, in November 2011, four years after the initial recall, the CPSC issued a press release warning consumers that children were continuing to be seriously injured by the BUMBO BABY SITTER despite the added warning language and the removal of the birthday party photo from the box.  In fact, the CPSC's own news release shows more reported injuries from the BUMBO BABY SITTER after the recall than before.[3] Specifically, after the 2007 recall, there were at least 45 reports of children being injured by falling out of BUMBO BABY SITTERS that were being used on elevated surfaces – including 17 more skull fractures.  And, there were an additional 50 reports of infants falling out of BUMBO BABY SITTERS that were being used on the floor and other unknown elevations –

---

[1] See Exhibit A, a copy of the CPSC website press release concerning the recall.
[2] See Exhibit F, a table of customer complaints received by BUMBO.
[3] See Exhibit B, November 22, 2011 News Release from the CPSC.

including two reports of skull fractures on the floor, and one report of a concussion.  Clearly, the initial recall did nothing to alleviate the dangerous nature of the BUMBO BABY SITTER.  The ineffectiveness of the "warnings only" recall is plainly demonstrated by the fact that more children were injured after the recall than before.[4]

**C.**    **4,000,000 BUMBO BABY SITTERS are Recalled in August of 2012 so that a Seat-Belt Can be Added to Make the Product Safe.**

13.    In the face of continuing injuries to children, and the realization that new warnings had done nothing to prevent or even slow down injuries caused by the BUMBO BABY SITTER, on August 15, 2012, the CPSC announced that 4 million Bumbo Baby Sitter seats – which amounts to every single BUMBO BABY SITTER seat sold in the United States from 2003 through 2012 - were being recalled because a seatbelt had to be added to the product to make it safe.[5] The CPSC cited all of the incidents that had occurred since the October 2007 recall as the reason for the mandatory design modification. Per the 2012 recall, consumers with BUMBO BABY SITTER seats were required to stop using their BUMBO products immediately until they could obtain a seatbelt kit from BUMBO and install it on the BUMBO BABY SITTER.  Although it came more than 10 years later than it should have, the BUMBO BABY SITTER will, now, finally be equipped with a simple seatbelt that will prevent countless injuries to children.

**D.**    **The Incident**

14.    In 2009, Michael Fisher purchased the BUMBO BABY SITTER at a BABIES "R" US store in Miami, Florida, and he gave the BUMBO BABY SITTER to his wife at her baby shower.

---

[4] See Exhibit C, March 15, 2012 Article from the Chicago Tribune, "Grave Concerns about baby seat," by Julie Deardorff.
[5] See Exhibit D, August 15, 2012 News Release from the CPSC.

15.     On July 13, 2009, around dinner time, D.F. was put into the BUMBO BABY SITTER seat and placed on top of the kitchen table, where his mother, Elisa Fisher, was directly and carefully supervising him. Elisa Fisher's use of the BUMBO was the exact type of use of the BUMBO that has been approved by Bumbo's officers. D.F. was six months old at the time. Suddenly and without warning, D.F. flipped out of the BUMBO BABY SITTER onto the floor, fracturing his skull. As a result of his injuries, D.F. was first treated at Lower Keys Medical Center in Key West, Florida and then taken by Life Flight helicopter to Miami Children's Hospital for extensive medical treatment.

**D.      Elisa Fisher and Michael Fisher Witnessed the Incident.**

16.     Elisa Fisher was next to her son when he fell out of the BUMBO BABY SITTER, and she witnessed the entire event.  Michael Fisher was walking into the kitchen at the time of the incident and caught his son after his son bounced off the floor, and he witnessed the entire event.

17.     At the time the Fisher's received and used the BUMBO BABY SITTER, it was defective and unsafe for its intended purpose.  Specifically, the BUMBO BABY SITTER was designed in a manner that would allow a child such as D.F. to easily fall out of the seat. Moreover, the BUMBO BABY SITTER was marketed as being safe to use "on any flat surface." The BUMBO BABY SITTER was also marketed for use on elevated surfaces, such as a kitchen or dining room table.  The BUMBO BABY SITTER did not contain a safety harness or straps to hold D.F. in place. Plainly, the BUMBO BABY SITTER failed, seriously injuring D.F.

**D.      Bumbo had Actual Knowledge that the Bumbo Baby Sitter was Defective and not Safe and that the Recall was Ineffective.**

18.     By October 25, 2007, the CPSC had received twenty-eight (28) reports of serious injuries; yet by that time, Bumbo was aware of sixty-eight (68) reports of children

falling out of the BUMBO BABY SITTER.  And, despite telling the world that the recall was "The Lamest Recall in the History of the World…"[6] Bumbo continued to receive reports of children falling out and injuring themselves.  In fact, by May 2010, Bumbo was aware of more than two hundred (200) reports of children falling out and/or injuring themselves, including more than one hundred complaints coming in after the recall.[7]  On November 22, 2011, the CPSC issued a press release stating that BUMBO was aware of at least 45 incidents in which infants fell out of a BUMBO seat while it was being used on an elevated surface after the October 25, 2007 recall.[8]  Among these incidents were 17 reported skull fractures to infants. The CPSC also noted that BUMBO was aware of at least 50 reports of infants falling out of the BUMBO BABY SITTER while the product was being used on the floor and at unknown elevations.  Among these 50 incidents were two reports of skull fractures and one reported concussion, all three of which occurred while the BUMBO BABY SITTER was being used on the floor.

**E.** **Babies "R" Us had Actual Knowledge that the Bumbo Baby Sitter was not Safe yet it Continued to Sell it to the Public – Including the Fishers.**

19.     BABIES "R" US learned of the recall of the BUMBO BABY SITTER on October 25, 2007, when it received a copy of the CPSC press released stating that it had received twenty-eight (28) reports of serious injuries, including three children suffering skull fractures from falling out of the BUMBO BABY SITTER.  After reviewing the CPSC press released, Greg Walker, an employee in BABIES "R" US' Safety Assurance Department, emailed numerous people within the BABIES "R" US organization and informed them that, "If the seat is placed on a table, countertop, chair, or other elevated surface, young children can arch their backs, flip out

---

[6] See Exhibit D, a copy of an article posted on Bumbo's website on December 29, 2007.
[7] See Exhibit E, a table of customer complaints received by Bumbo between September 2004 and May 2010.
[8] See Exhibit B, a press release from the CPSC dated November 22, 2011.

of the Bumbo seat, and fall onto the floor, posing a risk of serious head injuries.  Stores should advise guests to stop using the product…"

20.     On that same day, October 25, 2007, another BABIES "R" US employee, Dale Bomzer, emailed the president of BABIES "R" US – Jerry Storch – to inform him that the "CPSC has received 28 reports of young children falling out of the BUMBO BABY SITTER seat, including three skull fractures, which occurred when children fell out of chairs that had been placed on tables."

21.     Despite the nationwide recall of the product, and having direct knowledge of twenty-eight instances of children falling out, including three skull fractures, Jerry Storch issued a "directive" to get the BUMBO BABY SITTER "back on the floor this weekend [February 15, 2008]."  Faced with a "directive" from the president, BABIES "R" US rushed the product back into the stream of commerce on February 21, 2008, despite reports from individual stores that their BUMBO BABY SITTERS had not been modified to meet the recall requirements.  And within two weeks of forcing the product back onto the market, a BABIES"R" US Regional Vice President reported that the "safety stickers" were falling off the product, but he was told that "we don't have any liability here" because the CPSC approved the stickers.  Ultimately, in the all-out rush to meet Mr. Storch's directive, almost a 1,000 BUMBO BABY SITTERs were approved for sale to the public despite not having any of the CPSC-required warning language on them.

22.     The reason for Mr. Storch's "directive" was clear – money!  From May 2006 through June 2009, BABIES "R" US sold in excess of 566,000 BUMBO BABY SITTERs at a gross profit margin of 70.2%, for a total gross profit of more than $9,300,000.00.

23.     Marsha Costello – the senior national buyer in charge of all juvenile products for BABIES "R" US – testified that she would not have purchased the BUMBO BABY SITTER had she been told that Bumbo had knowledge of children falling out of the seat.  In fact, she testified as follows:

> **Q.   And in 2006 when you started selling that [Bumbo] didn't tell you children could fall out of the seat, right?**
> **A.   [Bumbo] did not.**
> **Q.   Did you know children could fall out of the seat?**
> **A.   I did not know that.**
> **Q.   If [Bumbo] told you children were able to fall out of the chair, would you have purchased the [Bumbo Baby Sitter]?**
> **A.   Probably Not.**

She also testified that in her more than 26 years of experience as a buyer for BABIES "R" US, including 13 years as the senior national buyer for juvenile products, which she could not think of any other baby seat that did not have a safety restraint:

> **Q.   Had you sold any other type of baby seat before at Toys "R" Us that did not have a safety restraint?**
> **A.   I can't think of one.**

Ms. Costello also testified that if even one child fractured his skull from falling out of the BUMBO BABY SITTER that it would be one too many:

> **Q.   If even one child fractured his skull from falling out of a Bumbo, is that one too many?**
> **A.   Personally?**
> **Q.   Personally.**
> **A.   Yes.**
> **Q.   As a buyer for Toys "R" Us do you have the same opinion?**
> **A.   Yes.**

Ms. Costello even admitted that she does not believe babies will stay in a BUMBO BABY SITTER and that children are not safe sitting in the BUMBO BABY SITTER:

> **Q.   Will the baby stay in the seat?**
> **A.   If the baby can move around, there is a chance the baby will not stay in the seat.**
> **Q.   The Bumbo keeps the baby safe?**
> **A.   I don't know how to answer that based on what's going on right now.**
> **Q.   Based on what's going on right now, does the Bumbo keep the baby safe?**
> **A.   No.**

24.   And Ms. Costello is not alone in her opinion regarding what a responsible corporate citizen like BABIES "R" US should have done.  Al Kaufman – BABIES "R" US' Vice President of Product Safety and Quality Assurance – has also testified that BABIES "R" US

should have taken a closer look into the dangerousness of the BUMBO BABY SITTER after they learned of dozens of incidents where children fell out, including three fractured skulls.  Mr. Kaufman testified:

> **A.   Assuming that that pattern of injury exists, it would certainly seem prudent to review the product and see whether any improvements could be made.**
>
> **. . .**
>
> **Q.   Okay.  Assuming we're talking about a fractured skull.  If the child sustains a fractured skull as a result of using an infant product, is that one fractured skull too many?**
>
> **A.   Again, I mean, I – certainly, it is a severe enough injury that it would warrant further investigation.**

25.     Despite Ms. Costello's and Mr. Kaufman's opinions as the senior buyer for juvenile products and vice president of product safety, respectively, BABIES "R" US never once: (1) questioned the BUMBO BABY SITTER'S safety, (2) asked BUMBO for a full history on reported incidents, (3) asked for test results on the product, (4) inquired as to alternative designs, or, most importantly, (5) stopped selling the product.

26.     BABIES "R" US had actual knowledge – at the highest levels of the company – of a defect to the product at the time it supplied the product to the Fishers (i.e. that children could and were falling out of the BUMBO BABY SITTER and injuring themselves because the BUMBO BABY SITTER did not properly restrain them and was not safe).  BABIES "R" US' behavior is and was reprehensible, reckless and willful, and demonstrates a wanton disregard for the public safety.

## CAUSES OF ACTION AGAINST BUMBO

### COUNT I
### STRICT PRODUCTS LIABILITY OF BUMBO –
### DESIGN DEFECT, MARKETING DEFECT, FAILURE TO WARN

27.     PLAINTIFFS incorporate herein the allegations of paragraphs 1 through 26.

28.     The BUMBO BABY SITTER in question was originally designed, manufactured, marketed, and sold by BUMBO.

29.     At the time that the BUMBO BABY SITTER was sold, BUMBO was in the business of designing, manufacturing, marketing, and selling BUMBO BABY SITTERS, such as the BUMBO BABY SITTER in question.

30.     BUMBO is the "manufacturer" in question of the BUMBO BABY SITTER. Plaintiffs therefore invoke the doctrine of strict liability as enunciated in § 402A of the Restatement (Second) of Torts, and by the Supreme Court of Florida.

31.     BUMBO is liable under the doctrine of strict liability for placing the BUMBO BABY SITTER in question into the stream of commerce and is liable for the injuries produced by the defects in the BUMBO BABY SITTER in question, including the injuries of PLAINTIFFS.

32.     At the time that the BUMBO BABY SITTER was designed, manufactured, marketed and sold by BUMBO, it was defective in design and unreasonably dangerous as designed.

33.     There was a design defect in the BUMBO BABY SITTER at the time that it left the possession of BUMBO in that it was designed in such a way that would allow a child such as D.F. to easily fall out of the seat.  Moreover, the BUMBO BABY SITTER suffered from an additional design defect in that it did not contain a safety harness or seatbelt to prevent a child such as D.F. from falling out.  These defects, both singularly and in concert, rendered the BUMBO BABY SITTER unreasonably dangerous.  Further, these defects were a producing cause of the accident and injuries suffered by PLAINTIFFS.

34.     A safer alternative design existed at the time the Fisher's BUMBO BABY
SITTER was manufactured.  Specifically, BUMBO could have incorporated  a safety harness,
seatbelt or other securing device into the BUMBO BABY SITTER that would sit low and tight
across the child's hips.  An example of a safer alternative design that BUMBO could have
incorporated  is as follows:



This, and possibly other design improvements, would have prevented a child like J.S. from
falling out of the BUMBO BABY SITTER.

35.     At the time of the accident, the BUMBO BABY SITTER was in substantially the
same condition as it was at the time it was placed into the stream of commerce.  PLAINTIFFS
made no modifications to the BUMBO BABY SITTER at any time.

36.     There is no applicable mandatory federal standard that applies to the specific
defects complained of herein.  But, to the extent that BUMBO attempts to rely on defenses or
rebuttable presumptions that the BUMBO BABY SITTER was not defectively designed because

it complied with all applicable Federal Standards, PLAINTIFFS allege that the Federal Standards are inadequate to protect children using the BUMBO BABY SITTER in a foreseeable manner.

37.    In addition, at the time that the BUMBO BABY SITTER was designed, manufactured, marketed and sold by BUMBO, it was defective and unreasonably dangerous because it lacked proper warnings.  BUMBO failed to warn consumers, like PLAINTIFFS, that there were numerous risks associated with using the BUMBO BABY SITTER on elevated surfaces.   BUMBO actively marketed the BUMBO BABY SITTER for use on elevated surfaces without adequately warning consumers of the risks associated with using the BUMBO BABY SITTER there.  BUMBO is strictly liable for this failure to warn because (1) there was a serious risk of harm associated with using the BUMBO BABY SITTER on an elevated surface, (2) BUMBO was actually aware of the risk associated with such a use, but it failed to adequately warn consumers of the risk of using the product in that manner, (3) the BUMBO BABY SITTER contained wholly inadequate warnings regarding the serious injuries that a child could suffer if the BUMBO BABY SITTER was used on an elevated surface, (4) the absence of the adequate warnings or instructions rendered the BUMBO BABY SITTER unreasonably dangerous to the ultimate consumer of the product, including PLAINTIFFS, and (5) BUMBO'S failure to adequately warn or instruct was a producing cause of PLAINTIFFS' injuries and damages.

<u>**COUNT II**</u>
<u>**NEGLIGENCE OF BUMBO**</u>

38.    PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 37.

39.    BUMBO committed acts of omission and commission, which collectively and severally constituted negligence, and which were a proximate cause of the injuries to PLAINTIFFS.

40.    BUMBO's acts of negligence include, but are not limited to the following:

(a)    Negligently designing the BUMBO BABY SITTER such that a child using the BUMBO BABY SITTER in a foreseeable manner could fall out;

(b)    Negligently designing the BUMBO BABY SITTER without a safety harness or seatbelt;

(c)    Negligently marketing the BUMBO BABY SITTER as safe to use on elevated surfaces;

(d)    Negligently marketing the BUMBO BABY SITTER by promoting its use on elevated surfaces;

(e)    Negligently marketing the BUMBO BABY SITTER by failing to adequately warn consumers of the risks and dangers associated with using the BUMBO BABY SITTER on elevated surfaces;

(f)    Negligently failing to test the BUMBO BABY SITTER to ensure that children using it in a foreseeable manner could not fall out; and

(g)    Negligently performing a mandated recall of the BUMBO BABY SITTER by failing to ensure that all BUMBO BABY SITTER seats sold after October 25, 2007 complied with the CPSC's mandatory recall requirements.

41.    At the time of the accident, the BUMBO BABY SITTER was in substantially the same condition as it was when it was placed into the stream of commerce.  PLAINTIFFS made no modifications to the BUMBO BABY SITTER at any time.

<u>COUNT III</u>
<u>BYSTANDER LIABILITY BY BUMBO</u>

42.    PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 41.

---

43.     At the time of the accident, Elisa Fisher, D.F.'s mother, was located immediately next to D.F. and she witnessed her son's accident and resulting injuries.  Elisa Fisher suffered severe physical shock and emotional distress from the direct emotional impact that occurred from her sensory and contemporaneous observation of her son's accident and resulting injuries. As such, Elisa Fisher is entitled to damages for the emotional distress and mental anguish that she suffered as a result of the accident and injuries to her son.

44.     At the time of the accident, Michael Fisher, D.F.'s father, was walking into the kitchen, near the table where D.F. was seated in the BUMBO BABY SITTER and he witnessed his son's accident and resulting injuries.  Michael Fisher suffered severe physical shock and emotional distress from the direct emotional impact that occurred from his sensory and contemporaneous observation of his son's accident and resulting injuries.  As such, Michael Fisher is entitled to damages for the emotional distress and mental anguish that he suffered as a result of the accident and injuries to his son.

## CAUSES OF ACTION AGAINST BABIES "R" US

### COUNT IV
### STRICT PRODUCTS LIABILITY OF BABIES "R" US –
### DESIGN DEFECT, MARKETING DEFECT, FAILURE TO WARN

45.     PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 44.

46.     The BUMBO BABY SITTER in question was sold by BABIES "R" US.

47.     At the time that BABIES "R" US sold the BUMBO BABY SITTER, BABIES "R" US was in the business of selling BUMBO BABY SITTERS, such as the BUMBO BABY SITTER in question.

48.     BABIES "R" US is the "seller" in question of the BUMBO BABY SITTER within § 402A of the Restatement (Second) of Torts and as enunciated by the Supreme Court of Florida.

49.     BABIES "R" US is liable under the doctrine of strict liability for placing the BUMBO BABY SITTER in question, which was defective as designed and marketed, into the stream of commerce and is liable for the injuries produced by the defects in the BUMBO BABY SITTER in question, including the injuries of PLAINTIFFS.

50.     At the time that the BUMBO BABY SITTER was sold by BABIES "R" US, it was defective in design and unreasonably dangerous as designed.  The BUMBO BABY SITTER was designed in such a way that would allow a child such as D.F. to easily fall out of the seat. Moreover, the BUMBO BABY SITTER suffered from an additional design defect in that it did not contain a safety harness or seatbelt to prevent a child such as D.F. from falling out.  These defects, both singularly and in concert, rendered the BUMBO BABY SITTER unreasonably dangerous.  Further, these defects were a producing cause of the accident and injuries suffered by PLAINTIFFS.

51.     At the time that BABIES "R" US supplied the BUMBO BABY SITTER to PLAINTIFFS, BABIES "R" US actually knew of a defect to the BUMBO BABY SITTER  (i.e. that it did not restrain children, that children could and had fallen out, that children had fractured their skulls as a result of falling out, that children had been injured by falling out of the product, that it did not have a restraint to keep the children in the BUMBO BABY SITTER, that it was the only infant seat that they were aware of that did not have a safety restraint, and that the BUMBO BABY SITTER was not safe for use).   BABIES "R" US also actually knew that the warnings and the marketing of the BUMBO BABY SITTER were defective because the CPSC mandated that the on-product warning be changed, that an additional on-product warning be added, and that the photos on the box that depicted the product being used on elevated surfaces be removed.  In fact, BABIES "R" US was actually aware that the CPSC had recalled the

BUMBO BABY SITTER for these precise defects.  Despite having actual knowledge of the defective nature of the BUMBO BABY SITTER, BABIES "R" US sold the BUMBO BABY SITTER that PLAINTIFFS used.

52.     In addition, at the time that the BUMBO BABY SITTER was sold by BABIES "R" US, it was defective and unreasonably dangerous because it lacked proper warnings. BABIES "R" US failed to warn consumers, like PLAINTIFFS, that there were numerous risks associated with using the BUMBO BABY SITTER on elevated surfaces.  The BUMBO BABY SITTER was actively marketed the BUMBO BABY SITTER for use on elevated surfaces without adequately warning consumers of the risks associated with using the BUMBO BABY SITTER on elevated surfaces.  BABIES "R" US is strictly liable for this failure to warn because (1) there was a serious risk of harm associated with using the BUMBO BABY SITTER on an elevated surface, (2) BABIES "R" US was actually aware of the risk associated with such a use, but it failed to adequately warn consumers of the risk of using the product in that manner, (3) the BUMBO BABY SITTER contained wholly inadequate warnings regarding the serious injuries that a child could suffer if the BUMBO BABY SITTER was used on an elevated surface, (4) the absence of the adequate warnings or instructions rendered the BUMBO BABY SITTER unreasonably dangerous to the ultimate consumer of the product, including PLAINTIFFS, and (5) BABIES "R" US' failure to adequately warn or instruct was a producing cause of PLAINTIFFS' injuries and damages

53.     At the time of the accident, the BUMBO BABY SITTER was in substantially the same condition as it was at the time it was placed into the stream of commerce.  PLAINTIFFS made no modifications to the BUMBO BABY SITTER.

## COUNT V
## NEGLIGENCE OF BABIES "R" US

54.     PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 55.

55.     The BUMBO BABY SITTER in question was sold by BABIES "R" US.

56.     At the time that BABIES "R" US sold the BUMBO BABY SITTER, TOYS "R" US was in the business of selling BUMBO BABY SITTERS, such as the BUMBO BABY SITTER in question.

57.     BABIES "R" US committed acts of omission and commission, which collectively and severally constituted negligence, which were a proximate cause of the injuries to PLAINTIFFS.

58.     BABIES "R" US' acts of negligence include, but are not limited to the following:

(a)     Negligently failing to verify that the BUMBO BABY SITTER was safely designed, and adequately tested by BUMBO prior to offering it for sale to consumers;

(b)     Negligently failing to ensure that the BUMBO BABY SITTER conformed to basic engineering and industry standards prior to offering it for sale to consumers;

(c)     Negligently failing to inquire whether BUMBO knew of any injuries to children using the BUMBO BABY SITTER prior to offering it for sale to consumers; and

59.     At the time of the accident, the BUMBO BABY SITTER was in substantially the same condition as it was when it was placed into the stream of commerce.  PLAINTIFFS made no modifications to the BUMBO BABY SITTER.  BABIES "R" US is liable for the aforementioned acts of negligence, all of which caused PLAINTIFFS' injuries.

60.     At the time that BABIES "R" US supplied the BUMBO BABY SITTER to PLAINTIFFS, BABIES "R" US actually knew of a defect to the BUMBO BABY SITTER  (i.e. that it did not restrain children, that children could and had fallen out, that children had fractured their skulls as a result of falling out, that children had been injured by falling out of the product, that it did not have a restraint to keep the children in the BUMBO BABY SITTER, that it was the only infant seat that they were aware of that did not have a safety restraint, and that the BUMBO BABY SITTER was not safe for use).   BABIES "R" US also actually knew that the warnings and the marketing of the BUMBO BABY SITTER were defective because the CPSC mandated that the on-product warning be changed, that an additional on-product warning be added, and that the photos on the box that depicted the product being used on elevated surfaces be removed.  In fact, BABIES "R" US was actually aware that the CPSC had recalled the BUMBO BABY SITTER for these precise defects.

61.     Despite having actual knowledge of the defective nature of the BUMBO BABY SITTER, BABIES "R" US sold the BUMBO BABY SITTER to PLAINTIFFS.

62.     BABIES "R" US is liable to the PLAINTIFFS' because it had actual knowledge of the defects in the BUMBO BABY SITTER at the time that it supplied it to PLAINTIFFS and those defects actually caused PLAINTIFFS' harm.

## COUNT VI
## BYSTANDER LIABILITY OF BABIES "R" US

63.     PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 62.

64.     At the time of the accident, Elisa Fisher, D.F.'s mother, was located immediately next to D.F. and she witnessed her son's accident and resulting injuries.  Elisa Fisher suffered severe physical shock and emotional distress from the direct emotional impact that occurred from her sensory and contemporaneous observation of her son's accident and resulting injuries.

As such, Elisa Fisher is entitled to damages for the emotional distress and mental anguish that she suffered as a result of the accident and injuries to her son.

65.     At the time of the accident, Michael Fisher, D.F.'s father, was walking into the kitchen near the table where D.F. was seated in the BUMBO BABY SITTER and he witnessed his son's accident and resulting injuries.  Michael Fisher suffered severe physical shock and emotional distress from the direct emotional impact that occurred from his sensory and contemporaneous observation of his son's accident and resulting injuries.  As such, Michael Fisher is entitled to damages for the emotional distress and mental anguish that he suffered as a result of the accident and injuries to his son.

## PUNITIVE DAMAGES AGAINST BUMBO

66.     PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 65.

67.     In 2002, long before BUMBO began selling the BUMBO BABY SITTER in the United States, BUMBO was alerted to the fact that its product needed a seatbelt.  In particular, in 2002, when BUMBO submitted the BUMBO BABY SITTER for testing to T.U.V. – an international testing agency – the BUMBO BABY SITTER failed its certification test because even though the product was designed to seat infants, it did not contain a seatbelt to ensure that its infant occupants were securely held in place.  Rather than looking at ways in which to redesign the BUMBO BABY SITTER with a seatbelt, BUMBO ignored the unfavorable test result, and resubmitted the BUMBO BABY SITTER to T.U.V. for testing under the "toy" category, where the seatbelt requirement was removed from the testing parameters. As expected, the BUMBO BABYSITTER passed once BUMBO improperly categorized it as a "toy" and tested it as a baby rattle or stuffed animal would be tested, and not as an infant seat.  BUMBO then began selling its product worldwide.

68.     BUMBO knew as early as 2004 that children were falling out of the BUMBO BABY SITTER.  BUMBO also knew, as early as 2004, that in conjunction with its marketing of the BUMBO BABY SITTER, parents were using the product on elevated surfaces, such as tables and chairs, and BUMBO was also actually aware that children were falling from these elevated surfaces and suffering serious injuries. BUMBO continued to receive numerous complaints of this nature in the years that followed.  In fact, s BUMBO'S sales of the BUMBO BABY SITTER increased, so did the complaints about the BUMBO BABY SITTER'S defects.  At the time the Fisher's received their BUMBO BABY SITTER, BUMBO had received no less than 200 complaints of children falling out of the BUMBO BABY SITTER, including multiple reports of skull fractures and other serious bodily injuries.

69.     Despite having actual knowledge of the dangers associated with the BUMBO BABY SITTER, and direct personal knowledge that the BUMBO BABY SITTER was causing serious injury to children, BUMBO refused to undertake any effort to evaluate a re-design of the BUMBO BABY SITTER to add a simple seatbelt to prevent children from getting out of it. This is despite the fact that BUMBO was actually aware of hundreds of incidents where children had fallen out and in many cases, were seriously injured using the BUMBO BABY SITTER. Had BUMBO effectively evaluated its design, warnings and/or marketing materials prior to PLAINTIFFS' use of the BUMBO BABY SITTER, PLAINTIFFS' injuries could have been prevented.

70.     BUMBO'S acts and omissions – failing to review, evaluate, and change its marketing and design of the BUMBO BABY SITTER - involved an extreme degree of risk – serious injury to children – and demonstrated a willful and wanton disregard for the rights and safety of others.  BUMBO'S conduct also deviated from the normal standard of care undertaken

by a manufacturer of products intended for use by children.  BUMBO was aware of the probability that children would get out of the BUMBO BABY SITTER, and could be seriously injured.  BUMBO was also aware of the magnitude of the potential harm that children, such as D.F., were likely to suffer as a result.  At the time of D.F.'s accident, BUMBO was actually aware of the real likelihood that children such as D.F. could be seriously injured using the BUMBO BABY SITTER.  Despite this, BUMBO did nothing to reduce or prevent the injuries of D.F. and other children like him.  As such, BUMBO was grossly negligent, and is liable for punitive damages.

### PUNITIVE DAMAGES AGAINST BABIES "R" US

71.     PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 70.

72.     BABIES "R" US had actual knowledge that children were falling out of the BUMBO BABY SITTER no later than October 25, 2007.  Despite this, BABIES "R" US continued to sell the BUMBO BABY SITTER both on-line and in its stores without doing any investigation into BUMBO or the BUMBO BABY SITTER.  Specifically, BABIES "R" US failed to verify that BUMBO had tested the BUMBO BABY SITTER to ensure that it complied with both industry and regulatory standards.  Further, neither prior to nor since offering the BUMBO BABY SITTER for sale has BABIES "R" US verified that the BUMBO BABY SITTER was designed in accordance with industry or regulatory standards.  This is despite the fact that BABIES "R" US had never done business with BUMBO, a foreign company, prior to selling the BUMBO BABY SITTER in the United States.

73.     BABIES "R" US' senior national buyer for juvenile products – Marsha Costello – has admitted that she probably would not have purchased the BUMBO BABY SITTER for sale through BABIES "R" US had she known about incidents of children falling out.  Yet, despite

now knowing about hundreds of incidents of children falling out, including multiple skull fractures, she continues to buy the BUMBO BABY SITTER for sale to the public. Ms. Costello has also said that she has actual knowledge that the BUMBO BABY SITTER is unsafe, yet she continues to purchase it for sale to the public. Finally, BABIES "R" US' Vice President of Product Safety and Quality Assurance – Al Kaufman – admitted that it would be prudent to look into a redesign of the product if there was a pattern of incidents where children fall out and get injured. Yet, despite having actual knowledge of almost three dozen incidents, including three skull fractures, BABIES "R" US did not stop selling the product, or even inquire about a safer alternative design. In fact, because BABIES "R" US wanted to rush the product back onto the shelves, it failed to ensure that all of the BUMBO BABY SITTERS that it sold complied with the CPSC's mandatory recall requirements. And, even more egregiously, BABIES "R" US knew that hundreds of non-recall compliant BUMBO BABY SITTERS were in BABIES "R" US' distribution channel and ending up in BABIES "R" US's stores, but BABIES "R" US never re-issued a stop-sale of the product.

74.     The foregoing acts and omissions by BABIES "R" US, in the face of actual knowledge of the dangers associated with the BUMBO BABY SITTER, involved an extreme degree of risk – serious injury to children – and demonstrated a willful and wanton disregard for the rights and safety of others. BABIES "R" US' conduct also deviated from the normal standard of care undertaken by a retailer of products intended for use by children, including those standards that BABIES "R" US required for its own-brand children's products. At the time the Fishers' BUMBO BABY SITTER was purchased from BABIES "R" US, and at the time of D.F.'s accident, BABIES "R" US was actually aware of the real likelihood that children such as D.F. could be seriously injured using the BUMBO BABY SITTER. Despite this, BABIES "R"

US did nothing to investigate the safety of the BUMBO BABY SITTER and reduce or prevent the injuries of D.F. and other children like him.  As such, BABIES "R" US was grossly negligent and malicious, and is liable for punitive damages.

## DAMAGES

75.     PLAINTIFFS incorporate herein the allegations of Paragraphs 1 through 79.

76.     PLAINTIFFS seek damages from Defendants arising from the injuries that D.F. suffered as a result of the accident.   Specifically, PLAINTIFFS seek damages for the following:

      (a)    Past and future medical expenses of D.F.;

      (b)    Past and future pain and suffering of D.F.;

      (c)    Past and future mental anguish of D.F.;

      (d)    Past and future disfigurement of D.F.; and

      (e)    Past and future physical impairment of D.F.

77.     PLAINTIFFS also seek damages from DEFEENDANTS arising from the emotional distress and mental anguish suffered by Elisa Fisher as a result of her witnessing her son's horrific and terrifying accident and resulting injuries.

78.     PLAINTIFFS also seek damages from DEFEENDANTS arising from the emotional distress and mental anguish suffered by Michael Fisher as a result of him witnessing his son's horrific and terrifying accident and resulting injuries.

79.     PLAINTIFFS also seek punitive damages from DEFENDANTS.

80.     PLAINTIFFS also seek pre-judgment and post-judgment interest as provided by law.

## JURY DEMAND

81.     PLAINTIFFS request a trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, that this cause of action be set for trial before a jury, and that Plaintiffs recover judgment of and from Defendants for their actual damages in such amount as the evidence may show and the jury may determine to be proper, together with pre-judgment and post-judgment interest, costs of suit, punitive damages and such other and further relief to which Plaintiffs may show themselves justly entitled, whether at law or in equity.

Respectfully submitted,

**DATED:  July 11, 2013**          /s/ M. Ross Cunningham_____
                                  M. Ross Cunningham
                                  Texas State Bar No. 24007062
                                  Alex Whitman
                                  Florida State Bar No. 86276
                                  Texas State Bar No. 24081210
                                  **ROSE WALKER, L.L.P.**
                                  3500 Maple Ave., Suite 900
                                  Dallas, TX 75219
                                  Telephone: (214) 752-8600
                                  Facsimile:  (214) 752-8700
                                  rcunningham@rosewalker.com
                                  awhitman@rosewalker.com